[Cite as *Shields v. Bur. of Workers' Comp.*, 2023-Ohio-1368.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

MICHAEL R. SHIELDS,   :

  Plaintiff-Appellee,  :

             No. 111774

  v.        :

BUREAU OF WORKERS'   :
COMPENSATION, ET AL.,

            :

  Defendants-Appellants.

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 27, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-20-931460

---

### *Appearances:*

Grubb & Associates, LPA, Natalie F. Grubb, and Mark E. Owens, *for appellee*.

Janet E. Burney, Anna Hlavacs, and Brian R. Gutkoski, *for appellant*.

MARY EILEEN KILBANE, P.J.:

{¶ 1} Defendant-appellant Greater Cleveland Regional Transit Authority ("RTA") appeals the jury verdict rendered in favor of plaintiff-appellee Michael R. Shields ("Shields"). For the following reasons, we affirm.

**Factual History**

{¶ 2} From 1989 through 2019, Shields was employed as a mechanic for RTA where he worked on the paratransit buses:

> On an average day, we would bring a bus in from the main facility garage. We would set it up on a lift. We would inspect the bus, the outside. We would lift it up, remove all the tires and then we would jack it up six feet over our heads and do maintenance work over our head, either changing oils or looking at certain suspension parts or changing parts, changing transmissions, heavy leaf springs, rear ends, front ends, shock absorbers or front end coil springs.

Tr. 199.

{¶ 3} On May 21, 2015, Shields suffered a left shoulder injury during the course and scope of his employment with RTA that was subsequently an allowed claim under the workers' compensation fund. The parties did not dispute the allowance of Shields's left shoulder injury. The issue presented in the instant case was Shields's claim of bicipital tendinitis to his right shoulder, a flow-through injury that was allegedly caused by the allowed left shoulder claim. We will detail Shields's relevant medical care following the May 2015 left shoulder injury.

{¶ 4} Following the May 2015 injury, Shields continued working full-time at RTA. Shields also received chiropractic care for his left shoulder from August 12, 2015, through October 21, 2015. Shields "gingerly" used his left arm at work. Tr. 223. Further, Shields testified that he gradually and continuously used his right arm more at work and in daily activities to compensate for his left shoulder injury. Shields testified that despite chiropractic care, his left arm and shoulder pain

became progressively worse, and he was referred to Dr. Kase, a surgeon with the Crystal Clinic in August 2016.

{¶ 5} In August 2016 — approximately one year following Shields's left shoulder injury — Shields experienced an increase in left shoulder pain while removing tires at work. On August 19, 2016, Dr. Kase diagnosed Shields with a traumatic partial tear of the left bicep tendon, partial tear of the left subscapularis tendon, and a lesion of the left shoulder, and he administered a cortisone injection in the left shoulder. Dr. Kase's physical examination encompassed both the left and right shoulders, and Shields's right shoulder tested positive on the Speed and Yergason tests.[1] Dr. Kase made no diagnosis regarding Shields's right shoulder. Shields denied that he experienced a work injury in August 2016.

{¶ 6} On January 9, 2017, Dr. Kase examined Shields due to complaints of right shoulder pain that had persisted for a few months. Shields testified at trial that his work duties at that time incorporated continuous overhead work and overhead lifting that aggravated both his shoulders. Shields further testified that he experienced less pain if he did not perform overhead work throughout his entire shift. During the January 2017 office visit, Shields received a cortisone injection in his right shoulder, and an x-ray of the right shoulder was obtained. The right shoulder x-ray found no fractures or dislocations and some degenerative changes.

---

[1] The Speed and Yergason tests are completed during a physical exam, and positive results for either test suggest the presence of bicipital tendinitis.

{¶ 7} On March 21, 2017, nearly two years after Shields sustained his left shoulder work-related injury, Dr. Kase performed surgery on Shields's left shoulder. Shields testified that following surgery he continuously wore a left arm sling and used his right arm for all activities. On April 3, 2017, during a follow-up visit with Dr. Kase, Shields complained of right shoulder pain greater than his left shoulder pain. Dr. Kase's office note stated Shields believed the right shoulder pain was caused by his need to overuse his right arm for the two years between his May 2015 left shoulder injury and his March 2017 left shoulder surgery. Dr. Kase's office note stated he would seek approval from the Bureau of Workers' Compensation for a diagnosis of bicipital tendinitis in Shields's right shoulder. Dr. Kase referred Shields for post-operative physical therapy for his left shoulder.

{¶ 8} RTA's medical expert, Dr. Mease, examined Shields on May 9, 2017, and concluded that Shields did not have bicipital tendinitis in his right shoulder as a flow-through injury from his 2015 left shoulder injury. At the time of that review, no MRI test of Shields's right shoulder had been completed.[2] In conjunction with her examination, Dr. Mease reviewed records from Wadsworth Chiropractic, Dr. Kase with Crystal Clinic, Crystal Clinic's emergency room, and physical therapy notes.

{¶ 9} On May 15, 2017, Shields returned home from a physical therapy appointment and began speaking with his wife who was working in the yard. Shields

---

[2] In July 2017, Dr. Mease reviewed Shields's right shoulder MRI.

remembered he had left a physical therapy pole in his car and went to retrieve it. When Shields reached for the pole in the back seat of his car, he experienced right arm pain. Shields testified that he immediately returned to the physical therapist who referred him to the emergency department. Emergency room notes dated May 16, 2017, include a diagnosis of bicipital tendinitis of the right shoulder. Dr. Kase's May 19, 2017 office note stated Shields complained of right shoulder pain that began when he lifted a heavy object in August 2016, and became worse as Shields used his right arm more to compensate for his left shoulder injury. Dr. Kase's office note also stated that Shields thought his right shoulder was reinjured when he reached for a therapy pole a few days earlier. The Speed and Yergason tests were positive on Shields's right arm. Dr. Kase diagnosed Shields with bicipital tendinitis of the right shoulder and provided a cortisone injection.

{¶ 10} A May 23, 2017 physical therapist's note stated Shields "report[ed] that] he was working in the yard on 5/19/17 pulling with his right arm when he felt a sharp, stabbing pain from his elbow to the middle of his chest." At trial, Shields denied that he provided those details to the physical therapist and stated the injury occurred when he picked up the physical therapy pole.

{¶ 11} On July 6, 2017, Shields's chiropractor referred him for a right shoulder MRI. The findings were consistent with a high-grade partial tear of the right shoulder.

{¶ 12} On July 17, 2017, Shields reported to Kase with right shoulder pain greater than left shoulder pain and numbness in his hands. Dr. Kase's office note

stated Shields did not feel fully recovered from the left shoulder surgery, but he wanted to return to work. On that same date, Dr. Kase released Shields to return to work full-time. While not reflected in Dr. Kase's office note, Shields testified that he felt RTA required him to return to work despite his ongoing right and left shoulder pain.

{¶ 13} Shields returned to work on July 25, 2017. Shields testified that he experienced no problems with his left shoulder, but had a constant, dull, ache in his right shoulder while working. On August 3, 2017, while lifting a wheelchair at work, Shields heard a pop in his right shoulder. Shields sought medical treatment from Dr. Kase that same day. According to Dr. Kase's office notes, Shields had been feeling better until the incident that day. Dr. Kase felt the MRI findings were consistent with right bicep tendinosis and a partial tear. Dr. Kase also felt the August 3, 2017 incident likely exacerbated the bicep tendinosis and partial tear although it was possible Shields experienced a rotator cuff tear.

{¶ 14} On August 29, 2018, Shields's medical expert, Dr. Kimberly Togliatti-Trickett ("Dr. Togliatti-Trickett"), completed an independent medical examination of Shields. Dr. Togliatti-Trickett performed a physical exam of Shields, obtained a verbal medical history from him, and reviewed the following medical records: Shields's first report of injury dated May 22, 2015; Dr. Kase's office notes dated May 23, 2017 and April 3, 2017; Dr. Mease's independent medical report dated May 12, 2017; a May 23, 2017 physical therapy note; July 6, 2017 MRI results; the Industrial Commission's records of proceedings dated September 14, 2017 and November 9,

2017; and a Bureau of Workers' Compensation letter requesting allowance of Shields's right shoulder bicipital tendinitis. Dr. Togliatti-Trickett related Shields's right bicipital tendinitis to his 2015 left shoulder injury.

{¶ 15} In August 2019, Shields underwent right shoulder surgery and was no longer able to work at RTA.

**Procedural History**

{¶ 16} On February 9, 2018, Shields filed a complaint in Cuyahoga C.P. No. CV-18-892797, seeking a right to participate in the Ohio workers' compensation fund for the additional condition of bicipital tendinitis of his right shoulder. On March 28, 2019, Shields dismissed that case without prejudice, and refiled the instant case on March 27, 2020.

{¶ 17} Discovery progressed and the case was set for trial. The discovery deposition and videotaped trial testimony of Shields's medical expert, Dr. Togliatti-Trickett were secured on June 11, 2021, and January 24, 2022, respectively. On February 18, 2022, RTA filed a motion in limine seeking to exclude Dr. Togliatti-Trickett's videotaped expert medical testimony. On April 21, 2022, April 25, 2022, April 26, 2022, and April 28, 2022, Shields filed motions in limine to exclude trial testimony.

{¶ 18} Trial commenced on May 6, 2022. The trial court did not rule on the outstanding motions in limine but held the motions in abeyance. On May 7, 2022, after the close of Shields's case in chief, RTA moved for a directed verdict. The trial court held the directed verdict motion in abeyance until the close of RTA's case.

Following RTA's case-in-chief, the trial court stated the ruling on its directed verdict was postponed pending the jury's verdict.[3]

{¶ 19} The parties agreed upon and submitted to the jury a joint set of jury instructions, verdict forms, and jury interrogatories. On May 10, 2022, the jury returned a verdict in favor of Shields. On June 7, 2022, RTA filed a motion for judgment notwithstanding the verdict ("JNOV") or, alternatively, a motion for a new trial. After the motions were fully briefed, the trial court denied them on June 27, 2022.

{¶ 20} On July 25, 2022, RTA filed a timely notice of appeal, presenting verbatim three assignments of error for our review:

> Assignment of error one: The trial court erred in permitting Dr. Trickett's purported expert opinion, elicited through leading questions, to reach the jury, despite the "internal and elusive" nature of the alleged injury and Dr. Trickett's admitted lack of an accurate and complete medical history and lack of knowledge regarding Appellee's use of his upper extremities for his job duties.
>
> Assignment of error two: The trial court erred by not directing a verdict in GCRTA's favor.
>
> Assignment of error three: The trial court erred by not granting GCRTA's Motion for Judgment Notwithstanding the Verdict (JNOV) or, alternately, motion for a new trial.

On September 16, 2022, the trial court granted RTA's motion to stay proceedings pending the outcome of the appeal.

---

[3] The record does not indicate the trial court ruled on the outstanding directed verdict.

**Legal Analysis**

**Introduction of Expert Testimony**

{¶ 21} In his first assignment of error, RTA contends that the trial court erred when it allowed the introduction of Dr. Togliatti-Trickett's videotaped trial testimony. Specifically, RTA argues that Dr. Togliatti-Trickett's testimony was unreliable and inadmissible because (1) Dr. Togliatti-Trickett performed an inadequate review of Shields's medical records, (2) Dr. Togliatti-Trickett obtained an insufficient oral history from Shields, (3) Dr. Togliatti-Trickett did not review a description of Shields's job duties but relied on hypothetical questions posed by Shields's counsel, and (4) Shields's counsel utilized leading questions.

{¶ 22} A trial court has discretion to admit expert testimony. Evid.R. 104(A). On appeal, a trial court's decision to admit medical expert testimony is subject to an abuse-of-discretion standard. *Walker v. Ford Motor Co.*, 8th Dist. Cuyahoga No. 100759, 2014-Ohio-4208, ¶ 23, citing *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, ¶ 9; *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 616, 687 N.E.2d 735 (1998). The term abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983); *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463.

{¶ 23} Pursuant to Evid.R. 702,

[a] witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

Evid.R. 702.

{¶ 24} There is no argument that the opinions presented by Dr. Togliatti-Trickett related to matters beyond the knowledge of laypersons and that the doctor's credentials and experience qualified her as an expert. Evid.R. 702(A) and (B). RTA argues that Dr. Togliatti-Trickett's testimony was not reliable under Evid.R. 702(C).

{¶ 25} "In determining whether the opinion of an expert is reliable under Evid.R. 702(C), a trial court examines whether the expert's conclusion is based on scientifically valid principles and methods." *Valentine*, 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, at ¶ 16, citing *Miller*, 80 Ohio St.3d 607, 687 N.E.2d 735 (1998); *Walker,* 8th Dist. Cuyahoga No. 100759, 2014-Ohio-4208, at ¶ 29.

{¶ 26} Here, RTA does not question the principles and methodology underlying Dr. Togliatti-Trickett's testimony, but the reliability and correctness of the facts she relied upon to reach her medical opinion. RTA's arguments ignore the premise of Evid.R. 702(C), which looks at novel scientific theories, and therefore the arguments lack merit. *See State v. Jordan*, 7th Dist. Harrison No. 06 HA 586, 2007-Ohio-3333, ¶ 20 (Defendant's argument that an expert witness's trial testimony was erroneously admitted in contravention to Evid.R. 702(C) was baseless because defendant's challenges to the expert testimony related to the reliability and correctness of the facts the expert relied upon rather than the expert's methodology.); *see also Goddard v. Children's Hosp. Med. Ctr.*, 1st Dist. Hamilton Nos. C-95-0278 and C-950295, 1996 Ohio App. LEXIS 2388, 3 (June 12, 1996) ("Evid.R. 702 appears to be limited to cases in which there are novel scientific theories.").

{¶ 27} RTA's contention that some of Dr. Togliatti-Trickett's opinions based upon hypothetical questions were inadmissible is also unpersuasive. Pursuant to Evid.R. 705, experts may provide an opinion in response to a hypothetical question. However, "[a]n expert cannot base his opinion upon facts assumed in a hypothetical question unless evidence tending to establish them is admitted into evidence, either through other witnesses or through the expert testifying upon his own personal knowledge." Evid.R. 703.

> The purpose of the rules governing the assumed facts which underlie the hypothetical question and the opinion-answer is to insure that the trier of the facts is aware of the facts upon which the opinion rests, so

that in the event the trier of the facts rejects these facts as not having been established by the evidence, it will then be warranted in rejecting the opinion also.

*Calvey v. Fairview Gen. Hosp.*, 8th Dist. Cuyahoga No. 67417, 1995 Ohio App. LEXIS 2612, 3 (June 22, 1995), quoting *Mayhorn v. Pavey*, 8 Ohio App.3d 189, 191, 456 N.E.2d 1222 (10th Dist.1982).

{¶ 28} RTA contends that Dr. Togliatti-Trickett's expert testimony was inadmissible when the doctor answered two hypothetical questions for which the assumed, underlying facts were not introduced as evidence during the trial. Specifically, Shields's counsel asked Dr. Togliatti-Trickett to assume Shields worked overhead on buses for fifty to ninety percent of his work day. Shields's description of his average work day indicated the majority of an average work day was spent working overhead and, thus, we find the record presented sufficient evidence supporting the hypothetical questions at issue. However, even assuming no trial evidence was introduced to demonstrate that Shields worked fifty to ninety percent of his work day on overhead activities, any concerns about Dr. Togliatti-Trickett's related opinion go to the weight of the evidence, rather than its admissibility, and the trier of fact would determine the weight to be attributed to the opinion. *Williams v. Parker Hannifin Corp.*, 188 Ohio App.3d 715, 2010-Ohio-1719, 936 N.E.2d 972, ¶ 26 (12th Dist.); *Mayhorn* at paragraph one of the syllabus ("consideration of the sufficiency of the factual content of the hypothetical question to be addressed as a factor in determining the weight to be given the opinion-answer.").

{¶ 29} RTA further argues that the use of leading questions during Dr. Togliatti-Trickett's trial testimony rendered the testimony inadmissible. Pursuant to Evid.R. 611(C), "leading questions are not the appropriate mode of eliciting testimony on direct examination," but the admissibility of such testimony is within the trial court's broad discretion. *Lambert v. Shearer*, 84 Ohio App.3d 266, 275-276, 616 N.E.2d 965 (10th Dist.1992). We do not find the trial court's introduction of Dr. Togliatti-Trickett's testimony obtained through leading questions was prejudicial or amounted to an abuse of discretion.

{¶ 30} As part of her review of Shields's case, Dr. Togliatti-Trickett reviewed medical records, examined Shields, and obtained a medical history from Shields. Dr. Togliatti-Trickett was not provided with copies of all of Shields's medical records related to his left and right shoulder injuries. The trial record also demonstrated that Shields's oral medical history to Dr. Togliatti-Trickett did not encompass all of Shields's complaints, diagnostic tests, and treatment he experienced related to his right shoulder. However, RTA's counsel cross-examined Dr. Togliatti-Trickett to address the defense's concerns about these potential deficits. It was then within the jury's province to discount the doctor's opinion if they found the expert testimony was lacking. *See Roscoe-Herbert v. Fabian*, 8th Dist. Cuyahoga No. 88558, 2007-Ohio-3263, ¶ 26 ("[B]ecause [the medical experts] based their causation opinions on an incomplete medical history, the jury could reasonably discount their opinions.") *Compare Jolett v. ATLM, Inc.*, 8th Dist. Cuyahoga No. 99173, 2013-Ohio-3143 (The trial court in a bench trial excluded medical expert testimony that

did not consider whether claimant's current medical condition was caused by an intervening cause where the expert medical testimony was submitted in the form of a report and opposing counsel was unable to cross-examine the expert witness.). Further, "a physician who examines a patient is competent to testify concerning the probable cause of an injury, even if he has no knowledge of other injuries suffered by the patient." *Johnson v. Talley*, 8th Dist. Cuyahoga Nos. 73581 and 73622, 1999 Ohio App. LEXIS 289, 11 (Feb. 4, 1999), citing *Baird v. Cincinnati Transit Co.*, 110 Ohio App. 94, 168 N.E.2d 413 (1st Dist.1959).

{¶ 31} All of RTA's arguments about Dr. Togliatti-Trickett's expert testimony go towards the credibility of her opinion rather than the admissibility of the evidence, and "[q]uestions of credibility and the weight to be given to each expert is a question for the jury to decide." *Warner v. DMAX Ltd., LLC*, 2015-Ohio-4406, 46 N.E.3d 202, ¶ 18 (2d Dist.); *Dejaiffe v. KeyBank USA Natl. Assn.*, 6th Dist. Lucas No. L-05-1191, 2006-Ohio-2919, ¶ 19 (Insufficiency of an expert witness's underlying facts relates to the weight of evidence rather than admissibility.). For the foregoing reasons, RTA's first assignment of error is overruled.

**Directed Verdict and Judgment Notwithstanding the Verdict**

{¶ 32} In its second assignment of error, RTA argues that the trial court erred when it denied RTA's motion for directed verdict. RTA argues in its third assignment of error that the trial court erred when it denied RTA's motion for

judgment notwithstanding the motion ("JNOV").[4]  For ease of discussion, we will address RTA's arguments about a directed verdict and JNOV collectively.

{¶ 33} A motion for directed verdict under Civ.R. 50(A) tests the sufficiency of the evidence, not the weight of the evidence nor the credibility of witnesses. *Wagner v. Roche Laboratories*, 77 Ohio St.3d 116, 119, 671 N.E.2d 252 (1996). Under Civ.R. 50(A)(4), a court may properly grant a motion for directed verdict when, after construing the evidence most strongly in favor of the party against whom the motion is directed, it finds that reasonable minds could come to but one conclusion on a determinative issue, and the conclusion is adverse to the nonmoving party.

{¶ 34} In evaluating the denial of a Civ.R. 50(B) motion for JNOV, a reviewing court applies the same test as that applied in reviewing a motion for a directed verdict. *Kanjuka v. MetroHealth Med. Ctr.*, 151 Ohio App.3d 183, 2002-Ohio-6803, 783 N.E.2d 920, ¶ 14 (8th Dist.), citing *Grau v. Kleinschmidt*, 31 Ohio St.3d 84, 90, 509 N.E.2d 399 (1987).  In reviewing a judgment on a motion for JNOV,

> [t]he evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied.

---

[4] RTA's third assignment of error also argues that the trial court erred when it denied RTA's motion for a new trial.  RTA's arguments pertaining to a motion for a new trial raised in RTA's third assignment of error will be discussed separately.

*Posin v. ABC Motor Court Hotel*, 45 Ohio St.2d 271, 275, 344 N.E.2d 334 (1976). As with motions for directed verdict, the trial court does not consider either the weight of the evidence or the credibility of the witnesses when ruling on a motion for JNOV. *Id.*

{¶ 35} Because both motions for directed verdict and JNOV test the legal sufficiency of the evidence, we review them de novo, with no deference to the court's decision. *Osler v. Lorain*, 28 Ohio St.3d 345, 347, 504 N.E.2d 19 (1986); *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 4.

{¶ 36} The Ohio workers' compensation system provides an exclusive statutory remedy for workplace injuries. *Clendenin v. Girl Scouts of W. Ohio*, 150 Ohio St.3d 300, 2017-Ohio-2830, 81 N.E.3d 438, ¶ 9; R.C. 4123.74. The statutory requirements of Chapter 4123 must be liberally construed in favor of the employee. R.C. 4123.95.

{¶ 37} To prevail on a workers' compensation claim, the employee must prove, by a preponderance of the evidence, that his or her injury occurred "in the course of, and arising out of, the injured employee's employment." R.C. 4123.01(C). There must exist a direct and proximate cause between the work-related accident and the claimed injury. *Munday v. S. Ohio Coal Co.*, 4th Dist. Meigs No. 03CA12, 2004-Ohio-2872, ¶ 11. The issue of proximate causation must be established through expert medical testimony. *Leasure v. UVMC*, 2d Dist. Miami No. 2016-CA-

21, 2017-Ohio-7196, ¶ 15, quoting *Randall v. Mihm*, 84 Ohio App.3d 402, 406, 616 N.E.2d 1171 (2d Dist.1992).

{¶ 38} An employee's workers' compensation claim may consist of a flow-through injury. A flow-through injury "is a condition developing in a body part not originally alleged to have been injured, but having been injured as a result of conditions previously allowed" in a workers' compensation claim. *Wilson v. Conrad*, 1st Dist. Hamilton No. C-980582, 1999 Ohio App. LEXIS 1661, 5 (Apr. 16, 1999), citing R.C. 4123.84(C). In other words, a flow-through injury subsequently develops in a body part not originally alleged to have been injured and arises out of a compensable physical injury. *Lewis v. Trimble*, 79 Ohio St.3d 231, 238, 680 N.E.2d 1207 (1997), citing *Dent v. AT&T Technologies, Inc.*, 38 Ohio St. 3d 187, 189, 527 N.E.2d 821 (1988); *Munday* at ¶ 11. To receive benefits for a flow-through injury, a claimant must demonstrate through expert medical testimony that a previously allowed injury was the proximate cause of the new, alleged flow-through injury. *Jones v. Med. Mut. of Ohio*, 8th Dist. Cuyahoga No. 82924, 2004-Ohio-746, ¶ 9; *Munday* at ¶ 11; *Leasure* at ¶ 15, citing *Kenyon v. Scott Fetzer Co.*, 113 Ohio App.3d 264, 266, 680 N.E.2d 1034 (8th Dist.1996); *Walker*, 8th Dist. Cuyahoga No. 100759, 2014-Ohio-4208, at ¶ 21.

{¶ 39} RTA argues that the trial court should have granted RTA's directed verdict or JNOV because construing the evidence most strongly in favor of Shields on the issue of proximate cause, reasonable minds could come to but one conclusion based on the submitted evidence and that conclusion was adverse to Shields.

Specifically, RTA contends that Dr. Togliatti-Trickett failed to present reliable medical testimony that established Shields's right shoulder injury was directly and proximately caused by his previously allowed left shoulder injury. Shields contends that he presented sufficient evidence to support his right to participate in the workers' compensation fund for the flow-through condition of right shoulder bicipital tendinitis.

{¶ 40} Expert medical testimony was provided by a board-certified medical doctor, Dr. Togliatti-Trickett, on Shields's behalf. Dr. Togliatti-Trickett testified that she completed a physical examination of Shields, obtained a medical history from him, and reviewed several of Shields's medical records as well as Dr. Mease's report that provided detailed information regarding Shields's treatment and diagnosis by his chiropractor, physical therapist, and surgeon. Shields's medical records indicated that Shields had reported intermittent right shoulder pain since August 2016, with the pain becoming more continuous in nature starting in March 2017. Shields attributed the right shoulder pain to his left shoulder workers' compensation injury that caused him pain and limited the use of his left arm from May 2015 through March 2017. Shields specifically testified that to compensate for his left arm and shoulder work-place injury, he had to increase the use of his right arm and shoulder. Dr. Togliatti-Trickett testified that she found no records or reports that demonstrated a preexisting, non-work-related medical condition caused Shields's right shoulder injury. Dr. Togliatti-Trickett testified that Shields's July 6, 2017 MRI did not diagnosis Shields with right bicipital tendinitis, but the findings supported

such a diagnosis. Based upon her review of the MRI; Dr. Mease's clinical notes and report; and the physical examination of Shields including his medical history, Dr. Togliatti-Trickett found that Shields's constant use of his right arm and/or increased overuse of this right shoulder resulted in right shoulder bicipital tendinitis that was a flow-through injury caused by his original May 21, 2015 workplace injury.

{¶ 41} On cross-examination of Dr. Togliatti-Trickett, RTA's counsel established that Dr. Togliatti-Trickett was not Shields's treating physician and she was hired to provide Shields with a written medical opinion. Dr. Togliatti-Trickett testified on cross-examination that she was not provided with all of Shields's medical records and those additional records would have provided more information. While such testimony served as an attempt to discredit Dr. Togliatti-Trickett, it did not demonstrate the introduction of insufficient medical testimony that would support the trial court's granting of a directed verdict or JNOV.

{¶ 42} In contrast to Dr. Togliatti-Trickett's expert medical testimony, RTA introduced the expert testimony of Dr. Mease. Dr. Mease opined that the MRI did not demonstrate bicipital tendinitis and Shields did not have bicipital tendinitis in his right shoulder. The jury was to evaluate the competing opinions of Drs. Togliatti-Trickett and Mease and determine which expert witness was the most credible. *Warner*, 2015-Ohio-4406, 46 N.E.3d 202, at ¶ 18 (2d Dist.) ("[T]he difference in the two experts' underlying factual assumptions may affect credibility, but do not affect admissibility. Questions of credibility and the weight to be given to each expert is a question for the jury to decide.")

{¶ 43} The trial court's denials of RTA's motion for directed verdict and motion for JNOV were supported by the evidence. Thus, we overrule RTA's second assignment of error and that portion of its third assignment of error that addresses a motion for JNOV.

**Motion for New Trial**

{¶ 44} Additionally in its third assignment of error, RTA argues that the trial court erred when it failed to grant RTA a new trial. RTA does not present new arguments in support of its motion for new trial, but reiterates the arguments previously presented in the first and second assignments of error.

{¶ 45} A motion for new trial is governed by Civ.R. 59 that reads, in pertinent part:

> (A) Grounds for new trial. A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:
>
> * * *
>
> (6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case;
>
> (7) The judgment is contrary to law;
>
> * * *
>
> (9) Error of law occurring at the trial and brought to the attention of the trial court by the party making the application.
>
> In addition to the above grounds, a new trial may also be granted in the sound discretion of the court for good cause shown.

{¶ 46} The standard of review we apply to a trial court's ruling on a Civ.R. 59 motion for new trial depends upon the grounds for the motion. *Robinson v. Turoczy Bonding Co.*, 8th Dist. Cuyahoga No. 103787, 2016-Ohio-7397, ¶ 23.

> A motion for new trial brought under Civ.R. 59(A)(1), (2), (3), (4), (5), (6), or (8) is reviewed for an abuse of discretion. *Gateway Consultants Group, Inc. v. Premier Physicians Ctrs., Inc.*, 8th Dist. Cuyahoga No. 104014, 2017-Ohio-1443, ¶ 12, 13; *Johnson v. Johnson*, 5th Dist. Stark No. 2015CA00076, 2015-Ohio-4748, ¶ 16-17; *GMS Mgt. Co. v. Coulter*, 11th Dist. Lake No. 2005-L-071, 2006-Ohio-1263, ¶ 20-21. A motion for new trial brought under Civ.R. 59(A)(7) or (9), is reviewed de novo. *Gateway Consultants Group* at ¶ 12, 22.

*Moore v. Moore*, 6th Dist. Erie No. E-17-011, 2018-Ohio-1545, ¶ 14.

{¶ 47} Upon a review of the record, we find that the trial court did not abuse its discretion when it denied RTA's motion for new trial pursuant to Civ.R. 59(A)(6), and the court did not err when it denied RTA's motion for new trial under Civ.R. 59(A)(7) and (9). RTA's third assignment of error regarding a motion for new trial is overruled.

{¶ 48} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, PRESIDING JUDGE

LISA B. FORBES, J., and
SEAN C. GALLAGHER, J., CONCUR